Good morning, Your Honors. Dennis Camerano on behalf of the appellants, the cargo claimants in this case. I'd like to reserve five minutes for everybody. Thank you. While the shoreline is not the demarcation point for a federal court's maritime jurisdiction, in deregulating interstate commerce, Congress did place a berm around the United States of America that carriers had to traverse in order to have COGSA wash over the Carmack Amendment. Here, the carriers did not cross the berm. What is that berm? Simply, it is notice and an opportunity to obtain the benefits of the Carmack Amendment, the presumptive or the default statute that applies to the overland segment of an international, intermodal shipment of cargo coming into the United States. So, just so I understand where you're going, do you agree that, taking your statement, that if there had been adequate notice that there is no prohibition in law of the parties to have agreed to extend COGSA to the inland part of the passage, that by contract, as COGSA provides, that the parties can agree to extend COGSA coverage, they could have extended coverage to the rail portion, and that the fact that they overrode Carmack isn't the issue. The question is whether there was adequate notice. Correct. They could override Carmack, but only if they gave the notice an opportunity that is required in Carmack. That is correct, Your Honor. And your specific authority for that proposition is? SOMPO. The SOMPO case is certainly on point. The Tammany and, I'm sorry, Your Honor, SOMPO v. Union Pacific, the Second Circuit decision, as well as its progeny, including the Tammany v. UP case out of the Southern District of New York, I submit that the closest decision I could determine from this Court is the Neptune Orient Lines v. Burlington case, thank you, Your Honor, which says, in effect, that in an intermodal, intermodal  import shipment that the Carmack amendment applies by its own wording. The position that cargo takes is consistent with the notice and opportunity requirement that this Court has long required of ocean carriers in the context of COGSA limitations of liability. I commend the Court to Morisake v. Alligator of Triumph, a 1993 case decision from the Court. The failure to offer the Carmack alternative subjects the carriers to the Carmack amendment, including its mandatory domestic venue provisions that are included in Carmack, which is 4911706. A review of the statutory provisions in Carmack, I'm sorry, in the deregulating statutes, I believe, as part of the deregulating process, Congress passed the Interstate Commerce Termination Act of 1995. To implement U.S. rail transportation policy at the time, Congress established the Surface Transportation Board. Congress empowered the Surface Transportation Board with authority to exempt certain rail operations from STB regulation, as well exempt rail operations could be performed outside of the Carmack amendment. In that same exempting provision, Congress said no exemption shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims consistent with Carmack. It is undisputed that the Surface Transportation Board exempted the subject container-on-flat car service that are concerned with these intramodal moves. That is included in 49 CFR 1090.2, and the exempt status is admitted by the Union Pacific in its brief at page 43. Even the exempting regulation, the CFR, refers to the notice and opportunity of the Carmack alternative, as it's referred to in the brief, as being required. Following the jurisdiction section in 105.02, the exempting authorizing provision, there is a rates section in ICTA. The rates section, which is Chapter 7, has within it 107.09. 107.09 says, in effect, that a rail carrier can enter into a contract with a shipper or shippers to provide specified services under specific rates and conditions which circumvent CARMAC. In other words, both 105.02 permits carriers to circumvent CARMAC, and arguably 107.09 also permits carriers to circumvent CARMAC. So the question is, are 107.09 contracts, as the appellees argue, immune from 105.02? We say the answer is no. And that is simply because it would be nonsensical for Section 105.02 to allow a certain category of rail contracts to permit specific rates and terms and circumvent CARMAC, provided or with the requirement that there be the CARMAC alternative offered, and at the same time for 107.09 to allow the same exempt contracts not have the CARMAC alternative. For the court to interpret a statute to give all the provisions a fact, which I believe is the appropriate way to interpret a statute, the proper interpretation in our view is to impose a requirement that in order for a valid 107.09 contract to exist, it presupposes compliance with 105.02's requirement to offer the CARMAC alternative. Having derived the benefits of exempt status under 105.02, UP cannot avoid the statutory obligation that is included in 105.02e, which is to offer the CARMAC alternative. Section 107.09 cannot impose the requirement that the CARMAC alternative be used by carriers to extract or circumvent the mandate of CARMAC in 105.02. I might say it's not even clear that the documents that the UP relies on in this case is really a 107.09 contract, and here's why. First, the UP answers its complaint by admitting it's a common carrier, not a common carrier. The subject documents that the carriers rely on are the IRTA and the MIDA. The IRTA, the full name of the IRTA is Exempt Rail Transportation Agreement. That document incorporates MIDA. The name of MIDA, the full name is Master Intermodal Transportation Agreement, formerly known as UP Exempt Circular 20-day 20-B. The MIDA also applies to every intramodal shipment tendered to the Union Pacific. This is hardly a document prepared for a shipper for specified services under specified rates and conditions, as contemplated by 107.09. Instead, UP services, as the names of its own documents are stated, are subject to the Exempt Container on Flight Car Service. In 2003, the TAMI v. UP case is particularly on point for the proposition that 107.09's application presupposes compliance with 105.02. So, to the Seventh Circuit in Yamazin v. Chicago and Northwestern, and UP, likewise supports the proposition that an enforceable shipping agreement should be in place, that deviates from CARMAC, requires compliance with 105.02. I need to go to the second issue, and that is, this Court is asked to determine whether a federal statute that applies, CARMAC, can be overwritten by a private party's bill of lading provision that says a different statute applies. In addressing this issue, I would like to point out, particularly Section 11, which specifically reserves the application of any other law relating to the duties, responsibilities, and liabilities after discharge from the ship, such as CARMAC, such as the Harder Act. So, Congress said CARMAC would not be deemed to override other federal statutes. In an effort, though, to rely on the principle espoused in the Kirby case. That's the Norfolk Southern v. Kirby. It's a Supreme Court case. However, Kirby did not grant the parties congressional authority to override CARMAC. The Supreme Court's concern in Kirby was the effect of applying state law agency rules to an intermodal bill of lading. Quoting Kirby, confusion and inefficiency will inevitably result if more than one body of law governs a contract's meaning. As we have said in Cossack, when, quote, a maritime contract may well have been made anywhere in the world, it should be judged by one law wherever it was made. Close quote. Back to Kirby quoting. Here, that one law is federal. The federal law that Kirby applied happened to be CARMAC. CARMAC was not argued by the parties. The U.S. brief and certiorari says the argument was waived. Kirby does not stand for the proposition that CARMAC displaces other statutes. Instead, the CARMAC amendment, part of the body of federal law, remains in effect. It remains applicable, despite the carrier's attempt to just write it out by a bill of lading provision, because they didn't clear the berm. The berm is simply notice and an opportunity to obtain CARMAC's benefits. As a result, the carriers are stuck in American soil with the domestic special venue provision that is included in CARMAC 11706. Thank you, counsel. Good morning, Your Honor. Alan Nakazawa on behalf of the appellees, Kawasaki, Keeson, Keisha, LTD, and K-Line America. If I may, Your Honor, I'd like to reserve five minutes as well. No, you're the, you don't have a cross appeal in this case, so you're just entitled to your 15 minutes. The first point I'd like to make is counsel has made a point that there's a conflict between CARMAC and CASA applying as a matter of contract versus CARMAC applying as a matter of law, and therefore, CARMAC having statutory rank should supersede CASA, but that is not the case here because CARMAC does not apply as a matter of law or as a matter of contract. My clients, K-Line is an ocean carrier, K-Line America is its agent. They are not rail carriers, and they do not come within the definition of a rail carrier under CARMAC. In addition, in this case, Your Honor, the transportation contracts which were entered into between K-Line and UP were Section 10709 contracts. They were bargained for, negotiated between UP and K-Line, which has thousands of containers that would be moving through UP. This is a 10709 contract that specifies terms and conditions. Section 10709 exposes the terms and conditions expressly, and if you look at the language in Section 10709, it states that 10709 private contracts, not private, but rail contracts, shall not be subject to this Part A. Part A includes the venue provisions. Part A includes the liability provisions of 11706 that requires the CARMAC alternatives to be offered. There's been, in this case, some confusion as to Section 10502 contracts under CARMAC and Section 10709 contracts. They are separate and apart. They have separate, distinct purposes. They apply to distinct services. 10502, or under 10502, the STB and its predecessor, ICC, had the power to exempt the STB from regulation certain rail carriers and services, but this power was not unlimited. The board could issue exemption orders to exempt certain rail carriers, but those rail carriers under 10502 and that exemption order still had to comply with the CARMAC liability provisions unless they provided CARMAC alternative terms. Section 10709 contracts are not tied in any way or related to a board exemption order. They're not related to Section 10502. There's no analog to Section 10502 in Section 10709. Roberts. What were the contracts at issue in SOMPO? 105, I think it's 10502 contracts. That's what the Court found, I think. That's correct. And the contracts here, we say, are 10709 contracts that are completely outside the scope of CARMAC. I don't think we said in Neptune which contracts we were dealing with. I don't think the 10709 contract was at issue in Neptune, and that's why we do not feel that that provides as much guidance. Again, the 10502 exemption is subject to board approval and revocation, but the Section 10709 private contract exemption is not subject to board approval and cannot be changed. It cannot be challenged by the board or parties for violation of any other provision of the Act. It's clear these are two separate types of contracts. This distinction of contracts. How are we certain that these are 10709 contracts? Well, the BDA does make reference that it is, but I would submit, Your Honor, that you look at, I think, what the BDA says, that where a railroad is providing services indiscriminately to shippers, issuing a bill relating to a shipper, offering their service generally to a public, then that's a 10502 or general contract. But on a private contract basis, where a railroad negotiates with a company like K-Line that has thousands of containers, and they agree and they bargain on specified rates and terms, that's a 10709 contract. That's what I would call a private contract under 10709. There is a distinction, and I think the definition of a rail carrier in CARMAC makes this clear, distinction between common rail carriage and rail contract carriage. Only rail common carriage is within the scope of CARMAC, and since the rail lay in this transportation was made pursuant to a section 10709 contract carriage case, it fits, it does not come within the scope of CARMAC, and CARMAC does not, and therefore the requirements of venue and CARMAC alternatives do not. So what I hear you saying is we have to construe and pigeonhole these contracts. There's nothing in the contract that says this is a 10709 contract. The META does state that, yes. The META does state that. It does say this contract is made under section 10709, yes. How do you deal with the argument that, in fact, you've conceded that this is your common carrier, that the intermodal agreement actually seems not to be a 10709 contract? Well, the referencing, you heard your opponent's argument first that you've conceded that it's a common carrier. You're dealing with common carriers all the way through. Did you not? We are doing, the ocean carrier is doing common carriage, ocean carriage under its bill of lading. Right. But the ocean carrier is not a rail carrier. It's not subject to CARMAC. But the rail carrier in this case is not a common carrier. The common carrier rail carrier, under the definition in 11025, which defines rail carrier, 101025, in Friends the 5, rail carrier includes only a person providing common carrier railroad transportation. That is not UP. UP is providing their services pursuant to a contract carrier rail transportation, and that's under ERTA and META. And so there is a distinction in the rules here between common carriage and private carriage. Right, but dealing with one bill of lading that identifies a common carrier, what difference does it make from your perspective? You're trying to take advantage of the one bill of lading in one respect and saying, no, you can segregate. On the other hand, the contract that we have with the cargo owner is the ocean bill of lading, which covers from loading all the way to the destination. The ocean carrier who may have made that contract is not a rail carrier, is not subject to CARMAC. But it is a common carriage, ocean bill of lading, but it is still not subject to the CARMAC. I think in that case, you have to focus then on the rail transportation. Was it the rail transportation provided by UP pursuant to a 105-02 contract, or was it provided pursuant to a 107-09 private contract or contract carrier type of transportation agreement? And I think in this case, it was clear that the UP, the transportation leg was being provided pursuant to a contract carriage rather than a common carriage. And a common carriage would be, for example, where the railroad would issue a bill of lading if, say, the cargo owner in this case had contracted directly with the rail carrier, and they had been issued a bill of lading, that would be a common carriage situation. Are you familiar with the London Underwriters case in the circuit that covered the, I think it was argued below, I didn't see either of you citing it in your briefs, but in that case, we held that you could extend COGSA terms by contract beyond the 107-09. Beyond the limits of COGSA, in that case it was, it didn't involve the Carmack Amendment, but we did say that you could by, under the COGSA agreement, bill of lading, you could extend the scope to an area that was excluded under the terms of COGSA. In that case, they were transporting a yacht on board, on the dock, excuse me, on the deck of the ship. Does that case inform any of our analysis in this case? I think it does apply here, in the sense that our ocean bill of lading, like the ocean bill of lading in Kirby, was a through bill that covered from the loading port, the sea leg, and then the land leg. And our bill of lading, as the bill of lading in Kirby, did extend COGSA all the way through to the destination, including the land leg. And courts have allowed that, and have confirmed in numerous occasions in the Ninth Circuit, that an ocean carrier could extend COGSA terms beyond the 107-09. So, an ocean carrier can extend COGSA beyond the dominium of COGSA, which would be tackled to tackle. We did that in Steric, but so then does, as counsel was arguing with respect to Kirby, let's go back to our more supreme authority, to what extent is it relevant that Kirby did not address the Carmack Amendment? That it was really talking about overriding state law. Does it change the equation, as counsel's arguing, when you have essentially private parties contracting to override a statutory provision? I don't think it does, because I think, first of all, the statutory provision, you're correct, Kirby did not reach that issue, Carmack wasn't raised. But I don't think it applies here, even if Carmack is a raise, where you have a 107-09 contract. And Carmack does not apply as a matter of law, so there is no conflict, statutory conflict with Carmack with the contractual extension of COGSA. We also think that the principles and policies of Kirby, which was to protect the uniformity of general maritime law over a maritime contract, that is the bill of lading, would call for this Court to follow the same reasoning of the Kirby Court by applying Carmack to the land leg and COGSA to the ocean leg, would be the policy that Kirby was trying to avoid, that is, the confusion and inefficiency of having multiple legal regimes apply to a notion of bill of lading, depending on whether the Carmack Amendment is in effect. And I don't think it applies here, even if Carmack is a raise, where you have a 107-09 contract, Kirby would call for this Court to follow the same reasoning of the Kirby Court by applying Carmack to the land leg and COGSA to the ocean leg, depending on whether the Carmack Amendment is in effect. And then the United States Supreme Court came down at Kirby and it broke that berm and it said that COGSA shall apply inland and it shall cover the Norfolk Southern Railroad in that case because they're protected under the Himalaya Clause and because we protect the uniformity and predictability of a single system of law. That's one reason to affirm the Court's decision to look at the Carmack Amendment. Kagan, you would agree that Kirby didn't reach the Carmack Amendment? I disagree with that entirely. Well, then how do we deal with that? There were five briefs that were filed before the Supreme Court that mentioned it, and in oral argument, Justice Stevens said, well, to the Attorney General, Solicitor Attorney General, what do we do if this had been a case where a separate domestic bill of lading had been issued by the railroad? And the Attorney Solicitor General said, well, then it might have been covered under Carmack, Your Honor, depending on the contract of the parties. But in this case, the MIDAS says on its face, 10709 governs. That's true, but wasn't it a what-if question that Stevens asked? I mean, DeSampo says that Carmack wasn't an issue. It wasn't really raised in the briefs and it wasn't addressed. Is that wrong? One month later, in the Altatus case, the Eleventh Circuit, building on the long line of cases that said Carmack does not apply unless a separate domestic bill of lading has been issued. In the Altatus case- But it doesn't make any difference in our circuit, does it? Neptune has already reached that issue. Well, Neptune reached the issue in passing, in dicta, in a case that was about whether or not they- I was on Neptune, and I don't think we thought it was going to be passing in dicta. We already reached it and decided it, so we're bound by Neptune. Your Honor, and I would say in light of Kirby. We can't, a three-judge panel can't overrule existing precedent in the circuit, so I think we're stuck with Neptune. And you may say we're wrong, and you may be right about that. Well, it's not only that, Your Honor. I think that this Court has more recently noted that Kirby did say that CASA can be extended inland, and the weight of authority is that- That was Starig, but, I mean, we didn't- I'm sorry? Were you citing Starig v. Marisk? I think it's the Sentry case, Your Honor. Well, we probably said it in Starig. Yeah. Well, the only reason we decided to publish in Neptune was to reach that issue. I'm sorry? The only reason we decided to publish in Neptune was to reach that issue, at least what Judge Goodwin's saying. Well, Your Honor, Neptune orients facts are also distinguishable. It did not involve a 10709 contract, which takes this shipment entirely out of- No, I agree with you on that. I agree with you. We didn't reach the contractual issue, but, I mean, to say that we haven't considered Kirby and we ought to overrule Neptune is something I don't think we can do today. Well, Neptune doesn't apply, Your Honor. Neptune doesn't apply. It did not have a 10709 contract. It had no indication that there was a through bill of lading. It did not indicate whether the parties agreed to extend COGSA. But the Tokyo Marine case, which comes out of the district court in this circuit, said that in a 10709 contract case, we do not apply the Carmack Amendment. It was on point with this. It extended COGSA inland, and the part and the railroad got the benefit, the UP Railroad got the benefit of the Himalaya Clause in the Ocean Carrier's Bill of Lading. The Altadas case that came out of the 11th Circuit followed the long line of cases that say if there's no separate domestic bill of lading, then it is not a Carmack Amendment case. And Altadas said, we hold this on the basis of all the decisions plus SWIFT, which is what SOMPO tries to make short SWIFT of. And it said that in all of these cases, Carmack has no application because COGSA supersedes, and Kirby makes that. And we're uniform in our decision with Kirby. And had the Altadas decision had a chance to talk about SOMPO, which had just came out a month before, I think that would have said that SOMPO, like the shipper's position in Altadas, is contrary to the Kirby decision. SOMPO is right now, what happened in SOMPO is it went back on remand. The railroad lost on remand. It is now before the Second Circuit again. With all of the Kirby, the Altadas, the SWIFT, and Neptune-Orient issues in it, and Union Pacific, intends, if necessary, to take it up to the Supreme Court. This is an issue which will go before the Supreme Court one day or another. It has to be. Well, they're waiting for us. They never take it up to the Supreme Court. Well, I hope so, Your Honor, because I think that this Court will find that Kirby and that Altadas are the governing rules. This is a decision, incidentally, with respect to an alternative offer of Carmack, which was not even raised below. Well, the Supreme Court needs to read Santo. It's a beautifully long, long, long, long opinion. Kirby is long as well, Your Honor. The alternative offer of Carmack was not even raised below. 10709 is not even referenced in the opposing brief below in response to the motion to dismiss. The alternative offer is a waived argument. MIDA says on its face, this is a 10709 contract. Judge Fischer found that it was a 10709 contract. She did not abuse her discretion in that finding. And her holding should be upheld on appeal. Thank you, counsel. Thank you. Thank you, Your Honor. Regarding Sampo, I would like to alert the Court that on remand, the District Court in Sampo did review UP's MIDA. Because at the time, it was called UP Exempt Circular 20B. That was a document that the District Court in Sampo expressly reviewed and concluded that it did not comply with the Carmack alternative and ousted the rail carrier of the limitation of liability. So what do we do with the MIDA that seems to reference section 10709? I think the appropriate view is to look at the document as a whole. Also, look at the service that the rail carrier was providing. A party cannot, by proclamation, simply say, this is 10709 service. And for magically it to be that. The court is entitled to look at the service that the rail carrier was providing, that is, the land leg of an intermodal continuous journey, and look at the exempt, the exemption. The fact is, this rail carrier was providing service as exempt service. That exemption arose from 105.02. Frankly, I think counsel maybe touched on the point, and that is, is this service that UP says applies to every intermodal unit that it carries on its line, is this a private contract with specified rates and specified services as contemplated by 10709? It's not a private contract, it's in the nature of a 105.02 contract because it says it applies to exempt services. The CFR says it's exempt services, COFC, container on flat car services. UP admits that this is exempt service. So the fact is, it is, this rail service is exempt service under 105.02. And a party saying, even though it's exempt service, we want it to be 10709, to do exactly what they want, which is to circumvent the requirement to offer the CARMAC alternative. And I don't believe that is a statutorily acceptable way, and certainly not one way which the courts that have really looked at the comparison between 10709 and 105.02 have said. They've said, look, you can't use 10709 to circumvent 105.02. If you look at the statutes, you'll read the statute as well. And by the way, counsel refers to COGSA as somehow superseding CARMAC. But counsel doesn't alert the court that the berm was created in the ICC Termination Act of 1995 with COGSA enacted in the 1920s. So certainly the berm was created well after COGSA was created. And I'm sorry I derailed myself by referring you. Counsel's misstatement on the order of the statutes. Under our contract, you have to go to Japan now. That's right. That's certainly the, thank you. And the concept is that these shippers who suffered a derailment in Tyrone, Oklahoma, somehow are being required now to litigate these matters in Tokyo, Japan. This shouldn't have nothing to do with Tokyo. And the CARMAC amendment has set up a berm. It applies. It was a small berm. The carriers can certainly commercially address the issue by including a bill of lading provision that says, gives the CARMAC alternative. And I might argue, I do argue that the bill of lading, the original bill of lading that's involved in this case, is not a 10709 contract. Really, we're talking about some buried document that's two layers down below, which the carriers are now trying to resurrect and place into the Ocean Bill of Lading. You mean the MEDA? That's correct. The MEDA is two steps below because it was the Ocean Bill of Lading, then the IRTA, and then the IRTA incorporates MIDA. So MIDA is two steps away from the original Ocean Bill of Lading. Thank you, counsel. Thank you. Thank you both for your arguments. The case is sure to be submitted for decision. Thank you. Yeah, thank you. Interesting case. We'll proceed to the last case on today's oral argument calendar, which is Crow versus Risley.
judges: Fisher, Paez, Lorenz